UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                                              :
AXA EQUITABLE LIFE INSURANCE                                  :
COMPANY,                                                      :
                                                              :          12-CV-5419 (KBF)
        Plaintiff,                                            :
                                                              :          OPINION & ORDER
            -v-                                               :
                                                              :
BONDED LIFE FUND, LLC, BREAN                                  :
MURRAY CARRET & CO., LLC,  and                               :
WILLIAM MCCLUSKEY,                                            :
                                                              :
        Defendants and Third-Party Plaintiffs,  :

            -v-

PROGRESSIVE CAPITAL SOLUTIONS,
LLC, GENE WEISS, EDWARD DURAN,
and JOHN PUGLISI,

        Third-Party Defendants.
-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: APR 0 9 2013

KATHERINE B. FORREST, District Judge:

    This is an action to determine the rightful owner of a life insurance policy

whose decedent beneficiary, so far as this Court can tell, never met any of the

potential owners.  That detail, however, plays no role in the legal determination as

to which entity is entitled to collect on the insurance policy held on the decedent's

life.

    On July 13, 2012, AXA Equitable Life Insurance Company ("AXA")

commenced this federal Interpleader action against defendants Brean Murray

Carret & Co. and William McCluskey (collectively, "Brean") and Bonded Life Fund,

LLC ("Bonded"). (Compl., ECF No. 1.) Bonded answered the interpleader complaint on August 24, 2012. (ECF No. 9); Brean answered on August 31, 2012. (ECF No. 14.) While other procedural events relating to this case occurred during the interim, what matters on this motion is that Bonded and Brean conducted discovery and Bonded moved for summary judgment on February 8, 2013. (ECF No. 65.) Throughout this litigation, Bonded's position has remained unchanged: it bought a life insurance policy on a man named E. Dan Corte, Jr. (the "Policy") on March 24, 2011; Corte died on January 12, 2012, and Bonded seeks payment under the terms of the Policy.

Brean asserts that it believed that it had purchased an interest in the Policy on March 25, 2011 – the day after Bonded asserts that it purchased the Policy. Brean concedes that it never received any of the necessary documentation to effect the assignment of the Policy or change of ownership, and that it never corresponded with the insurer as owner regarding the Policy prior to Corte's death. The parties do not dispute that Brean paid Progressive $225,000 for the Policy – and that it has received nothing in return except a role as party in this lawsuit.

For the reasons set forth below, this Court finds that there is no triable issue of fact on the motion before it: Bonded is the owner of the Policy and is entitled to the proceeds relating thereto.  That Brean has apparently suffered loss in relation to its dealings regarding this Policy is a separate issue, and one left for another day.

I.    FACTUAL BACKGROUND

Bonded and Brean agree to the facts set forth in all 49 paragraphs of
Bonded's Local Rule 56.1 Statement. (See Bonded Local R. 56.1 Stmt. of Undisputed
Material Facts ("Bonded 56.1"), ECF No. 67; Brean Response to Bonded 56.1
Statement and Counterstatement of Material Facts ¶ 1 ("The Brean Defendants do
not dispute items 1-49 set forth in Bonded's Rule 56.1."), ECF No. 92.)  In pertinent
part, those facts are set forth below.

On or about October 10, 2003, AXA issued Policy 153223251, insuring the life
of Corte. The Policy had a face value of $700,000. The initial designated beneficiary
was Corte's wife, Camille H. Corte.  After several transactions which are irrelevant
to this lawsuit, on or about December 2, 2009, Wells Fargo, N.A., became the owner
and beneficiary of the Policy. Thereafter, Progressive acquired a right and interest
in the Policy, including the right to sell and assign all ownership rights to the
Policy.

The Policy allows the owner to change the beneficiary on written notice in a
form satisfactory to AXA.  The Policy provides that the beneficiary is entitled to the
Insurance Benefit of the Policy.

Steve Eisler was an employee of Progressive during the period of March
through April 2011. During that time, Eisler was Progressive's account executive for
transactions with Bonded. (See Aff. Of Steve Eisler ("Eisler Aff.") ¶¶ 2-3, ECF No.
71.)  On March 24, 2011, Progressive and Bonded entered into an agreement

3

entitled "PURCHASE AGREEMENT between PROGRESSIVE CAPITAL

SOLUTIONS, LLC and BONDED LIFE FUND, LLC" ("the Agreement").  That

Agreement provided for the sale of the Policy from Progressive to Bonded and

indicated that

> [T]he Buyer and Seller agree that, in consideration of the mutual promises, representations, warranties and covenants contained herein, and for other good and valuable consideration, the Seller shall sell all right, title and interest in and to the U.S. life insurance policies subject to this Agreement and effectuate the assignment to the Buyer . . . .

(Purchase Agreement § III, Affirm. of Eugene Houchins Exh. A, ECF No. 69.) The

Agreement also provides that

> Subject to the provisions of Article IX below, the Seller hereby sells, transfers and assigns to the Buyer all of the Seller's rights, title and interest in and to the Policies and the Policy Documents . . .

(Id. § II.A.)  Article IX sets forth provisions for the Closing of Sale, none of which are

here at issue.  More relevant is the language of subsection E, which states

> The Seller understands and agrees that by signing the Agreement and after payment of the purchase price to the Seller with respect to such Policy: A. The Seller shall no longer have any right to designate the beneficiary of the Net Death Benefit. The Seller agrees that the beneficiary of the Net Death Benefit shall be the Buyer[1] . . . . D. The Buyer may exercise any of its rights as owner of the Purchased Assets without the Seller's consent.

(Id. § 2.E.) In the "Representations and Warranties" section, Progressive

represented that it

> has the right to sell, assign and transfer the Purchased Assets. Unless the same has been previously disclosed to the Buyer in writing, neither the Seller nor to the best of the Seller's knowledge after due inquiry, the Original Policy Owner (or any subsequent owner of the Policy), have previously pledged,

---

[1] Net Death Benefit is elsewhere defined as the total death benefit payable after any outstanding loans, loan interest and overdue premiums have been deducted.  (See Houchins Affirm., Exh. A, p. 4.)

assigned or promised any interest in the Policy to any person or entity in writing or otherwise . . . .

(Id. § IV.A.4.) The Agreement also contains a typical merger clause: "This Agreement shall constitute the entire agreement of the parties with respect to the subject matter and supersedes all prior oral and written agreements in regard thereto . . . ." (Id. § XII.H.)

Between March 24 and March 29, 2011, Progressive and Bonded agreed to some minor amendments to the Agreement – none of which related to any of its core terms. On March 29, 2011, Progressive and Bonded entered into a slightly revised Agreement containing these minor amendments, referred to as the Amended Purchase Agreement.

Bonded paid Progressive $422,000 for the Policy. The Purchase was effected through the execution and delivery of a number of documents – all of which were duly accomplished per the terms of the Agreement. On March 29, 2011, Wells Fargo executed an Ownership Change Request Form and Beneficiary Change Request Form with respect to the Policy. It designated Bonded as the new owner and beneficiary. On March 30, 2011, Eisler sent Bonded an email containing Ownership and Beneficiary Change request Forms. (See Eisler Aff. ¶ 6.) On April 1, 2011, Progressive and Bonded entered into a Policy Assignment Agreement under which Progressive assigned all of its right, title and interest in the Policy. On or about April 4, 2011, the Ownership Change Request Form and the Beneficiary Change Form requesting that Bonded be named owner and beneficiary were delivered to AXA.

5

On or about April 11, 2011, AXA sent Bonded a letter confirming that the requested change in the owner and beneficiary had been made. AXA specifically recognized that Bonded was now the owner and beneficiary of the Policy. Shortly thereafter, Bonded applied for and received a withdrawal of $8,000 from the cash surrender value of the Policy (reducing the face value of the Policy from $700,000 to $692,000). On or about April 20, 2011, Bonded requested that AXA correct its company name from "Bonded Life Company, LLC" to "Bonded Life Fund, LLC." Bonded also commenced paying premiums to AXA.

Eisler stated under oath that during his tenure at Progressive, he "was not aware of any dealings with Brean Murray, Carret & Co., LLC, and/or William McCluskey ('Brean Murray') that involved the Policy." (Id. ¶ 8.) Since Eisler was the Progressive account executive dealing with Bonded, he has stated under penalty of perjury that there is no way that Bonded could have known about alleged communications between Progressive and Brean that he himself was unaware of – and therefore could not have conveyed. (Id.)

During the period from April 2011 until February 2012 (the month following Corte's death), Bonded and AXA communicated with regard to the confirmation of Bonded's ownership, the Accelerated Death Benefit Rider, partial withdrawals, and other routine matters. From April 2011, until Corte's death, AXA recognized Bonded as the owner of the Policy. No other owners or beneficiaries appear in any of AXA's records concerning the Policy.

6

Corte died on January 19, 2012. On or about March 30, 2012, Bonded filed a claim for life insurance benefits payable under the Policy with AXA. By this time, Brean had emerged as a contender for the Policy proceeds – and AXA refused to pay either party; this interpleader action followed.

McCluskey, President of Brean, concedes that there were delays in the ultimate closing and sale of the Policy from Progressive to Brean – despite the fact that Brean transferred $225,000 to Progressive.  (See Aff. of William McCluskey ("McCluskey Aff.") ¶ 10, Dec. of James D. Fornari ("Fornari Decl.") Exh. A, ECF No. 91.)  During a call with AXA in January 2012, he learned for the first time that Bonded was listed as owner of the Policy. (Id. ¶ 12.)  Brean concedes that none of the key paperwork evidencing change of ownership or assignment was ever completed.  (See, e.g., Brean Mem. of L. in Opp. to Bonded Mot. for Summ. J. at 2, ECF No. 90 (acknowledging "the actual assignment document contemplated by the Brean Agreement was never delivered to Brean".)

In his affirmation in opposition to this motion, McCluskey states that after learning that Bonded was listed as owner, he called Bonded's President, Houchins. (See McCluskey Aff. ¶ 13.) According to McCluskey, during this conversation Houchins told him that "he had been in discussions with Progressive to buy the Policy and that during the course of those discussions he was told that another entity had purchased the Policy and actually owned it." (Id. ¶ 15.)  Brean's 30(b)(6) witness and Chief Financial Officer, Kenneth J. Kirsch, testified in this case that while he had thought that Brean had received documentation regarding the sale

7

from Progressive after it paid Progressive $225,000, he later learned that they had not and that he had been "horribly wrong." (See Dep. of Kenneth J. Kirsh at 24, Reply Aff. of Amanda M. Fugazy ("Fugazy Reply Aff."), Exh. B, ECF No. 98.) Kirsch was asked

> Q: So, to your knowledge, did Progressive ever execute forms, documentation or agreements necessary to effectuate the purchase of the policy and assignment of the proceeds to Brean?
>
> A: At the time of the purchase, I believed that was the case.
>
> Q: And now?
>
> A: Now, that is not the case. I obviously have painfully learned that that's not the case.
>
> Q: Did Progressive ever deliver to you this absolute assignment for that is referenced within the agreements?
>
> A: Ultimately no. It would be the same answer.

(Id., at 25-26.)

> Q: Did you get verification of coverage?
>
> A: I don't recall.

(Id. at 28.)

> Q: Prior the wiring the money, did you have signed change of ownership forms in your possession?
>
> A: We did not.
>
> Q: Did you have signed change of beneficiary forms in your possession?
>
> A: I did not.

(Id. at 28-29.)

> Q: Did Progressive ever provide Brean Murray with any proof of payment of premiums regarding the Corte policy?

8

A: Not that I can recall . . . .

(Id. at 56.)

> Q: Did Brean Murray ever receive policy statements regarding the Corte policy?
> A: We did not.
>
> Q: Did Brean Murray ever receive annual statements regarding the Corte policy?
>
> A: Not that I recall.
>
> Q: Did Brean Murray ever receive premium notices regarding the policy?
>
> A: Not that I recall . . . .

(Id. at 54-55.) John Puglisi of Progressive testified

> Q: At or about this time [March 25, 2011], did you also tell Bonded Life that the policy was owned by Brean Murray?
>
> A: To my recollection, no.
>
> Q: Did anyone else at Progressive then tell Bonded Life that the policy was owned by Brean Murray?
>
> A: To my knowledge, no.
>
> …
>
> Q: Did you ever at any time tell Mr. Kirsch and Mr. McCluskey that you had advised Bonded Life that the policy was owned by Brean Murray?
>
> A: I can't recall that I did.
>
> ….
>
> Q: By that, do you mean you don't recall telling Mr. McCluskey and Mr. Kirsch that?
>
> A: Correct.

(Dep. of John Puglisi at 49-50, Fugazy Reply Aff. Ex. D.)

Q: To your knowledge, did Progressive take any steps to transfer, convey or assign any rights in the policy to Brean Murray?

A: To my knowledge . . . to my knowledge – under the terms of this agreement, to my knowledge, no.

(Dep. of John Puglisi at 128, Fugazy Aff. Exh. C.)

Eugene Houchins of Bonded testified as follows:

Q: What, if anything, did you do to determine if Wells Fargo was in fact the owner of the policy at the time?

A: We requested and received a verification of coverage . . . .

(Houchins Dep. at 27.)

Q: Between the 24th of March, 2011, and the 29th of March, 2011, were you advised by Mr. Puglisi that Brean Murray and Mr. McCluskey had an ownership interest in this policy?

A: No.

Q: Did you have any discussions with Mr. Puglisi between the 24th of March and the 29th of March, 2011?

A: Not that I recall.

(Id. at 35.)

The story with respect to Brean's claim to Policy proceeds also starts back in March 2011.  On March 25, 2011, the day after Bonded and Progressive had entered into the Purchase Agreement, Progressive entered into a separate agreement with Brean (the "Brean Agreement"). In the Brean Agreement, Progressive did not represent that it was the owner of the Policy – but stated an intention to purchase the Policy and then to resell it thereafter. Brean was to contribute $225,000 towards this initial purchase of the Policy and share in the delta between what Progressive

had to pay to acquire the Policy and what it obtained from a subsequent sale. In connection with this transaction, the Brean Agreement states

> Immediately after closing, but in no event more than 24 hours thereafter, the Facilitator [Progressive] shall transfer, convey, and assign all of its right, title and interest in the Policy, and/or any proceeds thereto, to the investors, by delivering to the Escrow Agent . . . executed copies of all necessary documents, forms and agreements, including but not limited to, the Absolute Assignment Form set forth in Exhibit "B" hereof, necessary to effectuate such assignment.

(See Brean Agreement ¶ 1.2, Ans. Exh. A, ECF No. 14.)  Following the sale to Bonded, Progressive never paid premiums on behalf of Brean. Brean admits that "title to the Policy was transferred to Bonded". (See Ans. ¶ 28, ECF No. 14.) AXA never recognized Brean as the owner or beneficiary of the Policy. (See Brean 56.1 Oppo. ¶¶ 44-46.)  The first correspondence that AXA ever received concerning Brean and the Policy was after Corte's death. (Id.)

Due to the dispute regarding ownership of, and beneficiary status with respect to, the Policy, AXA commenced this interpleader action on July 13, 2012. On October 25, 2012, it deposited the sum of $717,964.71 into an interest bearing account with this Court. AXA has already deducted $6,000 in attorneys' fees prior to depositing the funds with the Court.

II.    STANDARD OF REVIEW

Summary Judgment is warranted if the pleadings, admissible discovery materials and declarations setting forth statements that would themselves be admissible at trial (that is, not objectionable, such as hearsay, etc.), demonstrate that there is no genuine issue of fact necessitating trial. Fed. R. Civ.P. 56(c); see

also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).  A genuine fact issues exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010)(citing Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008)). Where it is clear that no rational trier of fact could find in favor of the non-moving party, summary judgment is warranted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

Once a moving party has put forward facts showing that the non-movant's claims cannot be sustained, the opposing party must come forward with specific facts showing a genuine issue of material fact requiring trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Self-serving affidavits, sitting alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. BellSouth Telecommunc'ns Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996).

In addition, parties may not defeat summary judgment on the basis of conclusory allegations or assertions; they must offer some hard evidence in support of such factual assertions. See Hicks v. Baines, 593 F.3d 159, 166 (2d Cir, 2010); Brink v. Union Carbide Corp., 210 F.3d 354 (2d Cir. 2000) ("Rule 56 provides that any affidavits submitted in opposition to a properly supported motion for summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.")

Accordingly, the evidence proffered by the party opposing summary judgment must be of a type that would be admissible at trial.  Id. ("Thus, 'hearsay testimony . . . that would not be admissible if testified to at . . . trial may not properly be set forth in [a Rule 56] affidavit.'")(citing Fed. R. Civ. P. 56(e); H. Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir.1991); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir.1985) (a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial.")).

Ultimately, of course, a party must show that there is more than some metaphysical doubt as to the material facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.   APPLICABLE LEGAL PRINCIPLES

This central legal issue in this case is who owns the Policy – Bonded or Brean. That legal issue turns on rather simple legal principles: was there an effective assignment of the Policy to one or the other of these two parties?  In addition, Brean has asserted that if the Court finds that there has been an effective assignment, that assignment should be set aside on the basis of equitable principles of estoppel.

A life insurance policy is a "chose in action." See, e.g., Olmsted v. Keyes, 85 N.Y. 593, 598 (N.Y. 1881). To assign a chose in action, including a life insurance policy, parties must enter into a written agreement whereby the owner of the policy surrenders and transfers all right, title and interest in and to the policy to another.

13

See Aini v. Sun Taiyand Co., Ltd., 964 F.Supp. 762, 778 (S.D.N.Y. 1997). While

particular words are unnecessary to effect an assignment under New York law, the

assigning party must take some action evidencing his/her intent to assign the right,

title and interest. Id. An actual assignment is more than a mere promise that, in

the future, an interest might transfer; an actual assignment requires action that

effects such transfer. See Leon v. Martinez, 614 N.Y.S.2d 972, 974 (N.Y. 1994); see

also In re Pearl-Wick Corp., 15 B.R. 143, 145 (Bankr. S.D.N.Y. 1981), aff'd, 1982

U.S. Dist. LEXIS 11396 (S.D.N.Y. 1982).

## IV.   DISCUSSION

The facts here are entirely one-sided: Progressive assigned the Policy to

Bonded.  Bonded received all of the required documentation, including the formal

assignment, it was listed as the owner and treated as the owner of the Policy by

AXA throughout the duration of the insured's lifetime, Bonded paid the premiums

and communicated with AXA as owner.  There is no triable issue of fact as to

whether Bonded is the owner of the Policy entitled to payment of its proceeds: quite

clearly it is.

Brean was never an actual assignee of the Policy – there is not a scintilla of

evidence in the record that there was ever a present intent, at any time – let alone a

time when Progressive still owned the Policy – by Progressive to assign the Policy to

Brean.[2]  Under the case law, a future promise to assign is not itself an assignment.

---

[2] Perhaps there was a promise to assign the Policy in the future; if such a promise was made on
March 25 it was a promise to assign that which Progressive no longer owned (since Bonded
purchased the Policy on March 24).  The Court finds Brean's arguments that only a later Bonded
agreement was operative to be unavailing.

See Leon, 614 N.Y.S.2d at 974. Thus, as a matter of fact and law, this is not a case in which there are two assignees of the same policy. There is a single assignee, Bonded, which purchased the Policy pursuant to an effective assignment.

Brean argues that some form of "estoppel" should prevent a determination that Bonded owns the proceeds of the Policy. That argument is without merit. Brean's argument relies upon what it asserts was Bonded's knowledge that Brean had some form of interest in the Policy. This awareness, argues Brean, prevents Bonded from asserting a protected status as a bona fide purchaser without knowledge. Without that protected status, Bonded should be equitably estopped from asserting the protection of the rule that the "first-in-time" assignee is "first-in-right".

Brean's argument has both fatal factual and legal flaws. First, its "equitable" position requires reliance on an alleged out of court statement – an alleged telephone call occurring long after the purchase events in question.[3]

Even assuming, however, that Bonded can be charged with knowledge of Brean's negotiations with Progressive regarding the Policy, the outcome of this motion is unchanged. This is primarily because Progressive could not have sold the policy to Brean when it is alleged to have done so. It is undisputed that Bonded

---

[3] According to McCluskey and Kirsch of Brean, following Corte's death, when they learned of Bonded's interest in the Policy, they together called Houchins of Bonded. According to McCluskey, Houchins told him that he had been "made aware" of Brean's interest at the time of his purchase of the Policy; according to Kirsch, he does not recall if a time frame was given as to when Progressive may have told Bonded about Brean. (See Kirsch Dep. at 50-51.) Certainly this three-way conversation, conveying an alleged statement of a non-participant in the call (Puglisi) is likely inadmissible hearsay, indeed double hearsay: Puglisi to Houchins, Houchins to McCluskey and Kirsch. In order to be admissible, each level would need to be considered non-hearsay or fit within an exception. The Court finds it unlikely that such statements would be admissible, but it need not reach the thorny double-hearsay issues in order to grant summary judgment for Bonded.

entered into its purchase agreement on March 24 and that Brean did not enter into its purchase agreement until March 25 – Progressive thus had nothing left to sell. It is also undisputed that whatever events occurred between Brean and Progressive before March 25 did not constitute a sale by Progressive to Brean of the Policy because no contract of sale was entered into. Rather, it is undisputed that Brean's contract of sale was made on March 25. There are no facts supporting a triable issue as to whether Brean had any legal interest in the Policy before the date that Bonded purchased the Policy.

The factual flaws aside, the law also prevents a ruling in Brean's favor on this issue. Estoppel requires that Bonded have made some misrepresentation to Brean, on which Brean relied, suffering prejudice thereby. See Rose v. AmSouth Bank of Fla., 391 F.3d 63, 66 (2d Cir. 2004). Of course, there is not a single fact in the record that suggests Brean and Bonded ever communicated about the Policy until after Corte's death.  Brean does not even try to assert that Bonded misled it – indeed, Brean and Bonded appear to agree that the bad actor, in their view, is Progressive.  On such facts, there is no legal basis for an estoppel claim.

CONCLUSION

For all of the reasons set forth above, Bonded's motion for summary judgment on its claims is GRANTED.  It is entitled to the funds deposited with this Court in the amount of $717,964.71, plus any interest which may have accrued thereon.

In addition, the Court declines to exercise supplemental jurisdiction over the remaining third-party claims asserted by Brean against Progressive, John Puglisi,

16

Edward Duran, and Gene Weiss—none of which qualify for original jurisdiction in federal court.  See 28 U.S.C. 1367(c) (the Court may decline to exercise supplemental jurisdiction over a case in which it "has dismissed all claims over which it has original jurisdiction"); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  The third-party action is dismissed without prejudice.

The Clerk of Court is directed to close the motion at ECF No. 65, to adjourn all remaining dates, and to terminate this action.

SO ORDERED.

Dated:  New York, New York
        April 9, 2013

KATHERINE B. FORREST
United States District Judge